620 So.2d 1331 (1993)
LIUEBERG ENTERPRISES, INC.
v.
LIFEMARK HOSPITALS OF LOUISIANA, INC.
No. 92-CA-0869.
Court of Appeal of Louisiana, Fourth Circuit.
January 28, 1993.
On Rehearing March 24, 1993.
Writ Denied June 4, 1993.
*1332 Edward D. Wegmann, Harry S. Hardin, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for Lifemark Hospitals of Louisiana, Inc.
James A. Cobb, Jr., John F. Emmett, Emmett, Cobb, Waits & Kessenich, New Orleans, for Liljeberg Enterprises, Inc.
Before BYRNES, CIACCIO and LANDRIEU, JJ.
CIACCIO, Judge.
This suit arises from a dispute between Liljeberg Enterprises, Inc. and Lifemark Hospitals of Louisiana, Inc., over the interpretation of a contract between the parties regarding the operation of the pharmacy department of St. Jude's Hospital located in Kenner, Louisiana. For the following reasons, we affirm in part, reverse in part and amend the judgment of the trial court.

Factual Background
Plaintiff herein, Liljeberg Enterprises, Inc., [hereinafter "LEI"], is a Louisiana corporation owned by brothers John and Robert Liljeberg. On August 26, 1981, the Liljeberg brothers obtained under Section 1122 of the Social Security Act a "Certificate of Need" to operate a 300 bed acute care facility to be known as St. Jude's Hospital. The Liljebergs subsequently began negotiations with various hospital companies interested in funding and managing the prospective hospital. As part of any proposed transaction, the Liljebergs, who were pharmacists by trade, wanted an exclusive contract to provide pharmaceuticals and related services to the hospital for its patients. They sought a contract which would split the pharmacy revenue equally between LEI and the operator of the hospital.
In the latter part of 1981, the Liljebergs began negotiations with Lifemark Hospitals of Louisiana, Inc., [hereinafter "Lifemark"], a division of Lifemark Hospitals, which is a national hospital management facility. Lifemark strongly desired to acquire a flagship hospital in Louisiana, and approached LEI regarding LEI's certificate of need. The negotiations were carried out by John Liljeberg on behalf of LEI, who was assisted by two attorneys, one of whom was a CPA, an economist, and two pharmacy consultants who attended meetings both in New Orleans and Houston, Texas at various times. These negotiations culminated in 1983 with the execution of a long-term lease and loan agreement between Lifemark and LEI which essentially provided that Lifemark would provide permanent financing to LEI for the construction of the hospital and then lease the hospital from LEI for an amount equal to the debt service on the loan, plus additional rental payments based upon hospital occupancy. Under the terms of this agreement, ownership of St. Jude's Hospital would remain in the hands of the Liljebergs.
In addition, on February 10, 1983, the parties entered into a "Clinical Pharmacy Management Agreement" which provided that the Liljebergs would operate the pharmacy department in the hospital for the full term of Lifemark's lease of the facility. This agreement stipulates how LEI is to be paid for the pharmaceuticals and related *1333 services provided, and is the primary subject of dispute between the parties.
In January of 1984, subsequent to the signing of this agreement, Lifemark was acquired by American Medical International, Inc., [hereinafter "AMI"] which is now Lifemark's corporate parent.
St. Jude's Hospital opened on August 25, 1985, and plaintiff began providing pharmaceuticals and related services under the requirements of the contract. AMI began to reimburse LEI based on its interpretation of the pharmacy contract, which resulted in LEI receiving substantially less compensation for pharmaceuticals than it claimed it was due under the contract.
On July 9, 1987 LEI filed a petition in Civil District Court seeking a declaratory judgment that the contract was being misinterpreted by Lifemark. LEI later amended the petition to include a demand for damages. Lifemark subsequently answered the petition and reconvened seeking declaratory relief to validate its interpretation of the contract.
The crux of the dispute between the parties is the meaning of Exhibit B of the contract, which specified LEI's compensation in terms of a "fee for procedure." LEI argued that the contract was ambiguous and failed to indicate the clear expression of the parties' intention that LEI was to be reimbursed for the cost of the pharmaceuticals in addition to the fee per procedure. LEI further contended that Lifemark had deprived plaintiff of revenues in connection with the purchase of blood derivative products in contravention of express provisions of the contract. Lifemark, which had been reimbursing LEI only the fee for procedure and not the cost of the individual item, contended that its interpretation of the contract was correct.
On December 11, 1987, Lifemark moved for a partial summary judgment declaring that the contract was clear and unambiguous. The district court denied this motion, and referred the matter to a commissioner for trial.

Action of the Trial Court
This matter was tried before Commissioner Charles Rivet from September 11-25, 1989. At the commencement of trial, the parties stipulated that the issue of the bad debt allowance would be severed for a later determination, and the trial court did not hear evidence on this issue. We therefore will not address the issue of the allowance for bad debt, although we reserve Lifemark's right to raise this issue at a later date.
During the trial of this matter, extensive testimony and documentary evidence was introduced concerning the interpretation of the compensation provisions in the contract. Testimony was introduced, over defense objection, that the intent of the parties was to provide for repayment of the actual cost of the pharmaceuticals in addition to the fee for services, and that the average wholesale price rather than actual cost was to be used as a multiple in determining LEI's fee. There was also testimony presented that Lifemark failed to annually escalate the minimum fees set forth in Exhibit B as required by the contract.
On October 26, 1989, the Commissioner issued a twelve-page report and recommended judgment in favor of plaintiff and against defendant. He found that the contractual provisions regarding compensation were ambiguous and should be interpreted according to the intent of the parties, with any doubts being resolved against Lifemark, the drafter of the agreement. He concluded that Lifemark had been misinterpreting the compensation formula, and recommended a total monetary judgment of $9,173,359.00 in favor of LEI to cover the underpayment. This amount included $388,121.00 for blood derivative products which Lifemark had purchased from a source other than LEI.
The Commissioner recommended that a declaratory judgment be issued decreeing that Exhibit B of the contract henceforth be interpreted to provide for repayment of the actual acquisition cost in addition to the fee, together with the use of average wholesale price as the multiplier in determining this fee, and that the minimum fees *1334 which are currently being charged be escalated in accordance with Section 4.1(c) of the agreement, using March 1, 1984 as a starting date.
Lifemark filed exceptions to the Commissioner's report pursuant to LSA-R.S. 13:1171. On October 10, 1990, after hearing the exceptions, the trial judge rendered judgment decreeing that LEI's interpretation of the contract be applied and awarding damages to LEI in the amount of $8,785,238.00 against both Lifemark and AMI. On March 12, 1992, the trial court rendered an amended judgment deleting AMI from the original judgment.
In written reasons for judgment, the trial judge stated that he agreed with the Commissioner that Exhibit B of the contract was ambiguous and, in view of all the evidence presented, should be construed against Lifemark. However, the trial judge declined to award $388,121.00 of the recommended damages, the amount attributed by the Commissioner to compensate LEI for Lifemark's purchase of blood derivative products from a source other than LEI, in violation of the contract. The trial judge noted that the question of whether these damages were owed should await a determination of whether the pharmacy agreement as well as the hospital lease are violative of either the tying or exclusive dealing provisions of the Sherman Antitrust Act, which issue he severed for later trial. The trial judge admitted that neither party had either pled or presented evidence concerning this antitrust issue, but he indicated he was raising the issue himself because of the substantial public interest involved.
Several days after the trial court's rendition of judgment, Lifemark moved for a new trial. On February 8, 1991, the trial court vacated its earlier judgment and granted a new trial on all issues, including the antitrust concerns raised by the court. LEI sought supervisory review of this ruling, and on January 9, 1992, this Court found that the granting of a new trial was an abuse of discretion by the trial court. Accordingly, the order granting the new trial was reversed and the trial court's original judgment dated October 10, 1990 was reinstated.
Lifemark then filed a motion to amend judgment and/or for new trial as to the reinstated judgment. On March 19, 1992 the trial court denied this motion and issued the following reasons for judgment:
This Court finds that it is procedurally without any authority to hear a second Motion for New Trial.
Nevertheless the Court finds that there is merit to the position of the defendant that the contract is not ambiguous and does not provide for reimbursement of costs above fee for procedure or 1.35 times the average wholesale cost. However, the Court is without any power to amend the judgment or to grant a new trial since this is a second Motion for New Trial.
Following this judgment, Lifemark filed a suspensive appeal and LEI filed a devolutive appeal of the trial court's October 10, 1990 judgment.

Lifemark's Appeal
By its appeal, Lifemark contends that the trial court erred in finding the contract ambiguous as to the amount of compensation due LEI under the contract, and in allowing parol evidence to vary the terms of the contract. Specifically, Lifemark contends that the trial court erred in its interpretation of the contract that:
(1) LEI is to be paid the "fee per procedure" stated on Exhibit "B" plus the cost of each pharmaceutical supplied;
(2) average wholesale price is to be used as a multiple rather that actual cost in determining the "fee per procedure;" and
(3) the minimum fees set forth in Exhibit B are to be escalated beginning on March 1, 1984.
On appeal, this court must decide whether or not the trial court judgment interpreting the pharmacy contract in favor of plaintiff is manifestly erroneous.
Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. 2045. When the words of a contract are clear and explicit and lead to *1335 no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. 2046. The words of a contract must be given their generally prevailing meaning. LSA-C.C. 2047. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. 2050. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. LSA-C.C. 2056.

(1) The Payment of Actual Costs in Addition to the Fee

The first issue for our resolution is Lifemark's contention that the trial court erred in interpreting the contract to require LEI be compensated for the actual cost of the pharmaceuticals in addition to the fee.
A copy of the Clinical Pharmacy Management Agreement entered into by the parties is attached to this opinion as Appendix "A." Section 4.1(a) of the Agreement, provides in pertinent part:
As compensation for those pharmaceutical services provided by OPERATOR as specified above, and for pharmaceuticals and intravenous solutions furnished hereunder to inpatients or emergency room patients, LIFEMARK shall pay to OPERATOR the fee per procedure as shown on Exhibit B, which is attached hereto and incorporated herein for all purposes less 5% of such total of the fees per procedure as allowance, for bad debt.
Exhibit B, a copy of which is also made part of Appendix A provides:
LIFEMARK shall reimburse the OPERATOR the greater of (i) the minimum fee set forth below or (ii) a fee equal to 1.35 times cost as identified by invoice.
By the terms of this contract, LEI is referred to an the Operator. Lifemark contends that the Operator's fee per procedure includes the cost of pharmaceuticals, and LEI should therefore not receive reimbursement of the cost a second time. LEI argues that it is entitled to receive reimbursement of the cost of the pharmaceutical in addition to the specified fee.
The Commissioner found that the contract between the parties on this issue to be ambiguous and stated the following in his written findings:
It is likewise ambiguous whether LEI should receive its actual acquisition cost in addition to the fee described in Exhibit "B" of the contract. The term "fee" is not defined in the contract. LEI asserts that the fee represents compensation for professional services only and that its acquisition cost must be added onto the fee to fully compensate it for goods and services supplied under the contract.
In reaching this conclusion, the Commissioner relied on two provisions within the contract which he found contributed to the ambiguity. First, on the minimum fee schedule set forth in Exhibit B, the fee for partial fill I.V.'s which is listed at $5.25 states that this amount "includes cost of solution". (See Appendix A) The Commissioner stated that it was reasonable to infer from this language that while the fee for the partial fill I.V.'s included the cost of solution, the fees for the remaining items on the list were exclusive of cost.
Second, the Commissioner found that Section 4.2 of the contract further supports the conclusion that the fee did not include the cost of pharmaceuticals.
Section 4.2 provides in part:
Operator shall supply Lifemark an invoice on or before the tenth (10th) of each month for goods and services provided under this Agreement during the preceding month. (Emphasis ours.)
The Commissioner found that if Lifemark's interpretation that the fee referred to in Section 4.1 was inclusive of costs was correct, Section 4.2 which requires LEI to invoice Lifemark for goods and services would conflict with Section 4.1 providing only for reimbursement of a fee per procedure.
We have reviewed the pertinent provisions of the contract, and cannot say that the determination of the Commissioner, as adopted by the trial court, that the provisions of the contract were ambiguous with regard to reimbursement of costs is manifestly *1336 erroneous. Rather, our review of the record reveals ample support for the Commissioner's interpretation that the parties intended that LEI receive reimbursement for actual costs in addition to the fee per procedure set forth in Exhibit B.
Lifemark contends that the trial court erred in allowing parol evidence to vary the terms of the written contract. Although parol evidence is inadmissible to vary terms of a written contract, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity and to show the intent of the parties. Diefenthal v. Longue Vue Management Corp., 561 So.2d 44 (La.1990). When read in its entirety, it is clear that the parties intended the pharmacy agreement to provide that LEI be reimbursed for its costs in addition to the fee. In addition, the parol evidence introduced did not vary the terms of the agreement but merely supported its clear import.
At trial, John Liljeberg testified that prior to the execution of the contract, he was assured by representatives of Lifemark that he would receive his cost back on both minimum fee and non-minimum fee items in addition to the fee. Further, both Irv Gregory, Lifemark's Vice President for Corporate Development and Wendall Alford, the Director of the Pharmacy Department for Lifemark, testified that it was Lifemark's intention to reimburse LEI for the actual acquisition cost in addition to the fee per procedure. Although John Hedrick, the attorney who drafted the agreement for Lifemark, denied that it was Lifemark's intent to reimburse LEI for cost in addition to the fee, this was a credibility determination which the Commissioner resolved in favor of LEI and the trial court adopted, and we cannot say that this finding is clearly wrong.
Based on the provisions of the contract when read as a whole and the evidence with regard to the parties' intent on this issue, we conclude that the Commissioner did not err in interpreting the contract in favor of plaintiff. Although the trial court in its reasons for judgment for denying Lifemark's second motion for new trial on March 19, 1992 stated that there is merit to defendant's contention that the contract on this issue was not ambiguous, we are unable to afford any evidentiary weight to this finding as the trial court was without authority to entertain such a motion. Accordingly, the judgment of the trial court dated October 10, 1990 declaring that the Clinical Pharmacy Management Agreement provides for reimbursement of actual acquisition cost in addition to the fee is affirmed.
However, the judgment of the trial court does not specify the amount which was awarded for the additional cost of the pharmaceuticals. Our review of the record indicates that the only evidence with regard to the cost of the pharmaceuticals is contained in the report of Peat, Marwick & Main Co., certified public accountants, which was prepared at the request of defendants. In this report, the actual cost of the pharmaceuticals to LEI during the applicable time period is $4,534,731.00, without an adjustment for bad debt, which issue has been severed for a later determination. We hold that LEI is entitled to receive additional compensation in this amount, reserving to Lifemark its claim for reimbursement for bad debts.

(2) Average Wholesale Price v. Actual Cost

We turn next to Lifemark's argument on appeal that the trial court erred in interpreting the contract to require the use of average wholesale price rather than actual cost as a multiplier in the fee per procedure formula. Lifemark contends that the contract was not ambiguous and that the Commissioner improperly allowed the introduction of parol evidence on this issue.
The language which is the basis of this dispute is contained in Exhibit B to the contract, and provides as follows:
LIFEMARK shall reimburse the operator the greater of (i) the minimum fee set *1337 forth below or (ii) a fee equal to 1.35 times cost as identified by invoice.

(Emphasis ours)
(See Appendix A)
At trial, LEI argued the phrase "cost as identified by invoice" refers to the average wholesale price of the item rather than the actual acquisition cost as interpreted by Lifemark. In support of its argument, LEI introduced, over defense objection, the testimony of several witnesses who stated that the parties to the contract intended that LEI was to be reimbursed either the minimum fee or 1.35 times the average wholesale price of the pharmaceutical. LEI also introduced expert testimony to prove that the term "cost" was used in the pharmacy industry to indicate average wholesale price.
Since the opening of the hospital Lifemark interpreted this clause to mean actual cost and compensated Liljeberg accordingly. At trial, Lifemark introduced the testimony of several witnesses who were familiar with the contract negotiations between the parties and testified that Lifemark intended that actual cost be used as a multiplier in the fee per procedure formula.
In its report, the Commissioner stated as follows:
There is no question but that the contract is ambiguous, as to the meaning of "cost as identified by invoice." Does that mean average wholesale price or actual acquisition cost? No where in the agreement is the term defined. Nor does the agreement specify which cost or what invoice will be the gauge for determining LEI's compensation.
The Commissioner found the contract was ambiguous, and that the intention of the parties revealed that average wholesale price was to be used as a multiplier in this formula. We do not agree.
Our review of the Clinical Pharmacy Management Agreement fails to indicate that the phrase "cost as identified by invoice" is in any way ambiguous. In our opinion, the words of the contract are clear and explicit and when given their generally prevailing meaning lead to the conclusion that the parties intended that LEI be reimbursed the minimum fee or 1.35 times the actual cost of the pharmaceutical supplied.
The common or ordinary meaning of the term "cost" as stated in Webster's New Collegiate Dictionary is "the amount or equivalent paid or charged for something." In the present case, the record contains copies of invoices of pharmaceuticals sold to St. Jude Hospital Pharmacy by various manufacturers. These invoices contain a listing of the "actual cost" of the various items, in addition to the "store ret." and the "list price". We find that the term "cost as identified by invoice" clearly refers to the actual cost of the item as stated on the invoice.
Further, the evidence in the record fails to support the determination of the Commissioner with regard to the parties' intent. Rather, the record indicates that the understanding of John Liljeberg was that the actual cost of the item was to be used as a multiplier in determining the fee per procedure. By letter to Irv Gregory, a former Lifemark employee, dated November 11, 1985, (a copy of which is attached hereto as Appendix "B"), Liljeberg stated the following:
AMI interprets this paragraph [Exhibit B] so that the total reimbursement to us would be 1.35 the cost or $13.50 on an item costing $10.00.
Our understanding is that our fee will be $13.50 on an item costing $10.00 and the reimbursement would be $23.50the fee of $13.50 plus the cost of $10.00.
In addition, in a letter to John W. McDaniel, the Executive Director of the hospital, dated February 7, 1986, (a copy of which is attached hereto as Appendix "C"), John Liljeberg stated:
The parties to the Pharmacy Contract intended the return to be a fee of 1.35% times cost to be added to the cost of the merchandise.
This evidence clearly shows that it was John Liljeberg's understanding that actual cost was to be used as a multiplier rather than average wholesale price.
In addition, we find no support for LEI's contention that the phrase "cost as identified *1338 by invoice" referred to the actual wholesale price in pharmaceutical contracts. John Hedrick, the attorney who drafted the agreement for Lifemark, testified unequivocally that he selected the language used in the agreement, and the it was intended to reflect actual cost and therefore "cost" needed no further explanation.
Further, Lifemark attempted to introduce into evidence several contracts existing between itself and various hospitals across the country. In each of these contracts, although Lifemark was the operator of the hospital pharmacy, the fee schedule provided that Lifemark would be reimbursed a certain percentage times "the average wholesale price." The contracts further stated the source of the average wholesale price.
Although the Commissioner declined to allow evidence of these other contracts into evidence, we find that the action of the Commissioner was erroneous. These contracts are admissible on the issue of whether the terms in this pharmacy contract are ambiguous. We have reviewed each of the contracts which were proffered by defendant, and conclude that these documents clearly indicate that when average wholesale price is intended to be used as part of a fee schedule, the contract expressly so states, using the phrase "average wholesale price" and stating the source of that information.
We conclude that if the parties to this contract had intended that LEI be reimbursed the average wholesale price of the pharmaceuticals, the contract would have so stated. Rather, the fee schedule contained in Exhibit B of the Clinical Pharmacy Management Agreement expressly states that Lifemark shall reimburse LEI either the minimum fee or 1.35 times cost as identified by invoice. We find no ambiguity in this clause of the contract, and conclude that the Commissioner erred in allowing parol evidence to alter the express terms of the agreement. Rather, we conclude that the phrase "cost as identified by invoice" is not ambiguous, and refers to the actual cost of the drug purchased by LEI as shown on the invoices. Having so concluded, we find that the trial court's adoption of the Commissioner's interpretation that LEI is entitled to be reimbursed the greater of the scheduled minimum fee or 1.35 times the average wholesale price of the drug to be clearly wrong.
For these reasons, we reverse that portion of the judgment of the trial court which decrees that Exhibit B of the contract shall be interpreted to use average wholesale price as a multiplier in the fee per procedure formula.

(3) The Escalation of Minimum Fees

The next issue for our resolution is the correctness of the trial court's finding that Section 4.1(c) of the Clinical Pharmacy Management Agreement provides that the current minimum fees be escalated and that the starting date be determined to be March 1, 1984. That Section provides that the minimum fees expressed in Exhibit B shall be increased annually with the first adjustment to "be made as of the first day of the thirteenth (13th) month of the term of this Agreement." The parties dispute when the adjustments are to begin: LEI contends the adjustments should begin thirteen months from the effective date of the contract while Lifemark argues they should begin thirteen months after the hospital began operations.
Our review of the contract reveals that the "term of the Agreement" is not specifically defined in the document. However, a reading of the first paragraph of the contract indicates that the agreement which was signed by the parties on February 10, 1983 is to be effective "upon the commencement of the operations of the hereinafter defined Hospital by Lifemark." Accordingly, the reciprocal contractual obligations of the two parties were to be deferred until the date that the operation of the hospital commenced. The language in the agreement leads to the conclusion that the parties intended the term of the Agreement to be the opening date of the hospital. Nevertheless, we fail to find this phrase of the contract to be clear and explicit on its face, and therefore the meaning *1339 of the contract must be interpreted by searching for the parties' intent.
In the record before us, we find no evidence offered on behalf of LEI to indicate that the parties intended at the time of the execution of the contract that the minimum fees were to be escalated one year after the signing of the agreement. Although there was evidence offered by plaintiff's economic expert, Dr. Hugh Long, at the time of trial that the contract may have been misapplied, there is nothing in the record to show that the intent of LEI upon the signing of the agreement was that the fees be escalated one year thereafter. Rather, the record indicates to the contrary.
The pleadings which were filed in 1987 by LEI do not contain an allegation concerning the misapplication of the terms of the contract with regard to the escalation of minimum fees. This issue was not raised by LEI until immediately prior to the trial of this matter.
Further, by letter dated December 1, 1986 to Robert deMahy of LEI, Lifemark's successor expressed its interpretation of the date minimum fees were to be escalated under the terms of the contract: August 31, 1986, thirteen months after the hospital began operations. Although LEI responded to this letter on a separate issue by correspondence dated December 22, 1986, there was no indication made at this time that LEI had a different interpretation of the contract on this issue.
In addition, there is testimony in the record of John Hedrick, Lifemark's legal counsel, who stated that Lifemark's intent was to begin to escalate the minimum fees one year after the opening of the hospital.
Perhaps the most illustrative evidence in the record with regard to the parties' intent on this issue is the testimony of John Liljeberg, the chief negotiator for LEI. During trial, Mr. Liljeberg testified on cross-examination as follows:
Q. In March of 1988 there was no dispute concerning minimum fee escalations, correct?
A. It was my understanding at the time, no, but it was my understanding that the whole contract was in dispute at the time because it wasn't generating to me what the intent of the document was in dollars or otherwise.
Q. You are aware under the contract, were you not, that under this 4.1C that the minimum fees that are shown on Exhibit B were being escalated according to a formula under the contract each year?
A. I may or may not have understood that, yes.
Q. You are aware that the first increase in the minimum fees under the escalation clause took place sometime in 1986, a year after the hospital had opened, correct?
A. That sounds correct.
Q. At that time you didn't have any dispute about that escalation securing one year after the date the hospital opened, correct?
* * * * * *
A. I didn't because it was not a point of issue. The whole contract was in dispute. The answer is no.
* * * * * *
Q. It's now your position that the minimum should have been increased in '84 and '85 and it shouldn't have been first done in '86; is that correct?
A. That's correct.
Q. And the reason why you are taking that position now is because somebody you retained to look at the contract told you that he thought that's what was intended under the contract?
A. If I hired him, yes, sir.
Q. But that idea came from that expert that you retained, not from yourself, correct?
A. That's correct.
This testimony clearly shows that Mr. Liljeberg's complaints regarding the escalation of the minimum fees did not arise until the suggestion was made by his economist, Dr. Long, after litigation had ensued. We find that the evidence in the record shows that the common intent of the parties at the time this agreement was signed in 1983 *1340 was that the minimum fees would be escalated beginning thirteen months from the date the hospital began operations. We conclude that the trial court's finding to the contrary is manifestly erroneous, and we therefore reverse the judgment of the trial court insofar as it determines the starting date for the escalation of the minimum fees to be March 1, 1984. Based on the record before us, we find that any adjustments in the minimum fees should have begun thirteen months from August 25, 1985, the date St. Jude's Hospital began operations.
However, the record indicates that the fees were not properly escalated by Lifemark from the date the hospital opened, and defendants do not dispute this point. Plaintiff's economist, Dr. Long, calculated the damage to LEI based on this error to be $274,471.00, and there was no other evidence presented which suggests a different amount. We find no error of the trial court in awarding this amount to Liljeberg, and the judgment is affirmed in this regard.

LEI's Appeal
By its appeal, LEI contends that the trial court erred in failing to award damages for Lifemark's failure to purchase blood derivative products from LEI. Section 2.6 of the Clinical Pharmacy Management Agreement provides:
OPERATOR shall not provide nor be entitled to any compensation, for the following:
* * * * * *
(b) all blood, except blood derivative products such as volume expanders, plasma, albumin, etc.
Lifemark has stipulated to its liability for the purchase of these products from a source other than LEI; however, the parties dispute the amount owed as a result of Lifemark's failure to compensate LEI for the breach.
The Commissioner awarded plaintiff the amount of $388,121.00, which figure was presented by Dr. Hugh Long, plaintiff's expert in economics and health care finance. Dr. Long reached this figure by calculating 1.35 times the average wholesale price of the product.
The trial court declined to make an award to plaintiff for this sum, and severed the issue for trial at a later date. The trial court in its reasons for judgment stated that this issue should await a determination of whether or not the lease agreement or pharmacy agreement violate either the tying or exclusive dealing provisions of the Sherman AntiTrust Act.
Lifemark then filed a motion for new trial, which was granted by the trial court to give the court an opportunity to try the antitrust issues. However, LEI applied for supervisory relief from this ruling, and this court vacated the trial court's order granting a new trial. This Court held that the trial court had no authority to raise the antitrust issues after trial, which had not been pled or argued by either of the parties.
We conclude that the failure of the trial court to award plaintiff damages for Lifemark's admitted breach of contract was clearly wrong. We therefore reverse that portion of the judgment which declines to grant an award of damages for that breach.
However, the award recommended by the Commissioner was based on the use of 1.35 times the average wholesale price of the product, which we find is not supported by the language of the pharmacy agreement. We find that the agreement between the parties reveals that actual cost rather than average wholesale price is to be used as a multiplier in determining the amount owed for blood derivative products. A review of Dr. Hugh Long's report and attached charts, which is the only evidence in the record which calculates damages on this issue, indicates that the amount owed by Lifemark for these products based on a formula of 1.35 times the actual cost is $169,191.00. Accordingly, we amend the judgment of the trial court to award LEI $169,191.00 in damages for Lifemark's failure to compensate them for blood derivative products.

*1341 Decree

Accordingly, for the reasons assigned, the judgment of the trial court dated October 10, 1990 is affirmed insofar as it states that the Clinical Pharmacy Management Agreement is interpreted to provide that Liljeberg Enterprises, Inc. shall be entitled to receive reimbursement of its actual acquisition cost in addition to the fee per procedure. LEI is awarded the additional compensation of $4,534,731.00, which represents the total actual cost of the pharmaceuticals purchased by LEI during the applicable time period, without an adjustment for bad debt.
The judgment is also affirmed insofar as it awards damages to LEI for the improper escalation of minimum fees, in an amount which has been determined to be $274,471.00. However, the judgment is reversed insofar as it determines the starting date of the escalation of minimum fees to be March 1, 1984. We hold that the term of the Agreement as expressed in the contract is the opening date of the hospital, August 25, 1985. Based on the provisions of the pharmacy agreement and the clear intent of the parties, we hold that minimum fees shall be increased annually, with the first adjustment on September 1, 1986, the first day of the thirteenth month of the term of the Agreement.
In addition, the judgment of the trial court which declares that the Clinical Pharmacy Management Agreement is interpreted to provide that Liljeberg Enterprises, Inc. shall be entitled to receive the greater of the minimum fee or 1.35 times the average wholesale price of the drug is hereby set aside and reversed. We hold that actual cost is to be used as a multiplier in determining the fee.
Finally, the judgment of the trial court dated October 10, 1990 is amended to award damages in the sum of $169,191.00 to LEI for Lifemark's failure to purchase blood derivative products from LEI pursuant to the provisions of the contract.
The judgment is therefore recast to award damages in favor of Liljeberg Enterprises, Inc. and against Lifemark Hospitals of Louisiana, Inc. in the following amount:

Cost of Pharmaceuticals $4,534,731.00
Escalation of Minimum Fee $ 274,471.00
Blood Derivative Products $ 169,191.00
 _____________
TOTAL $4,978,393.00

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Liljeberg Enterprises, Inc. and against Lifemark Hospitals of Louisiana, Inc., in the sum of $4,978,393.00, with legal interest from the date of judicial demand until paid and for all costs of the proceedings at the trial level. Each party is to bear its own costs of this appeal.
AFFIRMED IN PART; REVERSED IN PART AND AMENDED.

APPENDIX A

CLINICAL PHARMACY MANAGEMENT AGREEMENT
AGREEMENT, made and entered into this 10th day of February, 1983, by and between LIFEMARK HOSPITALS OF LOUISIANA, INC. ("LIFEMARK") and LILJEBERG ENTERPRISES, INC. ("OPERATOR"), to be effective upon the commencement of operations of the hereinafter defined Hospital by LIFEMARK.

WITNESSETH:
1. General.
LIFEMARK has made an offer to lease and operate an acute care general hospital which is proposed to be known as ST. JUDE HOSPITAL ("Hospital") and located in Kenner, Louisiana. It is the desire of LIFEMARK to engage the services of OPERATOR to manage and operate Hospital's Pharmacy Department (the "Department").
1.1 LIFEMARK desires to receive these services, and OPERATOR desires to provide same, at a level of quality of pharmaceutical and hospital care consistent with: (i) that of the patient community in which Hospital is located and (ii) LIFEMARK's standards pursuant to Section 8.2 of this Agreement. OPERATOR shall operate the Department under the general philosophy of LIFEMARK Pharmacy Management, *1342 Inc. or its successor ("LIFEMARK Pharmacy").
1.2 Therefore, LIFEMARK hereby appoints OPERATOR to operate and manage the Department in the name, for the account, and on behalf of LIFEMARK, pursuant to the terms of this Agreement.
2. OPERATOR's Responsibilities.
2.1 OPERATOR shall at all times furnish a licensed pharmacist to serve as Director of Pharmaceutical Services (subject to the approval of LIFEMARK in its sole discretion), who will supervise the Department's operations and all personnel working within the Department. The Director of Pharmaceutical Services (the "Director") shall be monitored by a regional manager or other representative of LIFEMARK Pharmacy who shall consult with the OPERATOR on the performance of the Director and the operation of the department.
2.2 In addition to the Director, OPERATOR shall provide, at its expense, adequate personnel to perform the duties necessary to operate the Department twenty-four hours a day, seven days per week. All pharmacists shall be duly licensed and shall be on duty each day for such length of time and during such hours as LIFEMARK Pharmacy determines is necessary to accomplish the foregoing. OPERATOR shall be solely responsible to the Department's personnel for their wages, compensation and employee benefits ("employee benefits" being defined as an employer's contribution to FICA, unemployment compensation and other employment taxes, worker's compensation, group life and accident and health insurance premiums, retirement, disability and other benefits). In the event that at any time in the sole opinion of LIFEMARK, an employee of OPERATOR is not complying with the Hospital's rules and regulations or is not operating the Department in the best interest of the Hospital, OPERATOR agrees to replace such employee upon LIFEMARK's request.
2.3 OPERATOR shall equip the Department with pharmaceutical service equipment necessary, in the sole opinion of LIFEMARK Pharmacy, to fulfill the terms of this Agreement. All such equipment shall be and remain the property of OPERATOR during and at the termination of this Agreement.
2.4 OPERATOR agrees to obtain from LIFEMARK Pharmacy all of Hospital's inpatient (including emergency room patients) requirements for pharmaceutical services, including, without limitation, drugs, medicines, and intravenous solutions, to the extent LIFEMARK Pharmacy can provide same. LIFEMARK Pharmacy shall supply these items at cost. Nothing in this Agreement shall prevent OPERATOR from acquiring those items from another supplier if i) the cost for those items is less than what LIFEMARK Pharmacy would charge and ii) the quality of those items is equal to or superior to those supplied by LIFEMARK Pharmacy.
2.5 OPERATOR shall provide to Hospital's medical staff and nursing service a modern, patient-care oriented system to include, but not limited to:
(a) introduction, implementation, and maintenance of a unit dose system of medication distribution; which shall comply with the system of LIFEMARK Pharmacy as that system may exist from time to time;
(b) introduction and implementation of an I.V. admixture program; which shall comply with the program of LIFEMARK Pharmacy as that program may exist from time to time;
(c) screening of patient profiles for possible adverse drug/drug interactions;
(d) screening of patient profiles for possible drug/allergy incompatibilities or I.V. incompatibilities;
(e) provide drug information services;

*1343 (f) conduct inservice educational programs pertaining to pharmaceutical services of pharmaceutical subjects for appropriate committees and staff of Hospital;
(g) development and printing of pharmacy Policies, Procedures, and Operations manuals;
(h) participation in the Pharmacy and Therapeutics Committee or equivalent committee of Hospital;
(i) participation in the Infection Control and Audit Committees, if requested by Hospital;
(j) participation in Hospital's drug surveillance and utilization review program;
(k) provide service of bedside rounds with the attending physician if requested by Hospital;
(l) participate in cardiopulmonary resuscitation attempts occurring during pharmacy hours of operations, if requested by Hospital; and
(m) Operator shall sell to LIFEMARK employees all pharmaceutical items at cost plus 10 per cent.
2.6 OPERATOR shall not provide, nor be entitled to any compensation, for the following:
(a) all drugs and supplies utilized by the ancillary departments of the Hospital in preparation for, during, or immediately following departmental patient related procedures, except those patient identifiable charges in which the cost of the drug is not included in a fee or charge for that procedure. Ancillary departments shall include, but not be limited to, radiology, anesthesiology, and clinical labs;
(b) all blood, except blood derivative products such as volume expanders, plasma, albumin, etc.
(c) irrigating solutions not requiring the addition of drugs;
(d) supplies or devices used for the administration or infusion of parenteral or irrigating solutions; and
(e) those non-medical, sundry items used for patient care or comfort including, but not limited to, mouthwash, talcum, and shampoo.
2.7 The services performed by the Department shall conform to the standards of the Joint Commission on Accreditation of Hospitals, the Department of Health and Human Services, state and federal agencies exercising authority over the Department and LIFEMARK's standards pursuant to in Section 8.2 of this Agreement. All updates and amendments will be considered part of Exhibit C for the purposes of this Agreement. All employees of OPERATOR shall comply with, keep and observe all the rules and regulations of Hospital and provide such services as are proper for the efficient conduct of a Department within an acute care general hospital.
2.8 OPERATOR shall pay prior to delinquency all personal property taxes properly assessed against its equipment and its inventory of drugs and supplies in use at the Hospital.
3. LIFEMARK's Responsibilities.
3.1 All medical and professional matters as they relate to the Department shall be and remain the responsibility of LIFEMARK and Hospital's medical staff.
3.2 The intent and understanding of the parties is that LIFEMARK retains full control and responsibility for the comprehensive operations of Hospital, including the Department; provided, however, that OPERATOR is delegated the authority to make management decisions during the normal course of daily operations of the Department without the prior consultation or approval of LIFEMARK pursuant to the Hospital's policies and procedures and the direction of LIFEMARK Pharmacy.
3.3 LIFEMARK shall have the sole obligation for establishing the fees charged to patients by the Department, all patient billing and the collection of all patient charges (including third party reimbursement) for pharmaceutical *1344 services provided by the Department.
3.4 Upon termination or expiration of this Agreement, for whatever reason with the exception of termination under Section 5.1(e) of this Agreement, LIFEMARK agrees to purchase from OPERATOR all usable pharmacy inventory and supplies then on hand in the Department. Unless otherwise mutually agreed, the purchase price for said inventory and supplies shall be determined in accordance with the procedure in Exhibit A and shall be paid to OPERATOR in not more than six equal monthly installments, which shall become due on the 15th day of each month commencing with the month next following the month in which this Agreement is terminated.
3.5 LIFEMARK shall pay all salaries, travel expenses, and other expenses of the employees of LIFEMARK Pharmacy.
4. Compensation.
4.1(a) As compensation for those pharmaceutical services provided by OPERATOR as specified above, and for pharmaceuticals and intravenous solutions furnished hereunder to inpatients or emergency room patients, LIFEMARK shall pay to OPERATOR the fee per procedure as shown on Exhibit B, which is attached hereto and incorporated herein for all purposes less 5% of such total of the fees per procedure as allowance, for bad debt. The allowance for bad debt shall be reviewed after each fiscal year of the Hospital and changed to reflect the actual percentage of uncollectable accounts for the preceding fiscal year of the Hospital.
(b) In the event that LIFEMARK requests services of the Department not set forth in Exhibit B, LIFEMARK and OPERATOR shall negotiate a revision to Exhibit B or a fee to be charged by OPERATOR to LIFEMARK each time an additional service is provided at LIFEMARK's written request.
(c) LIFEMARK agrees that OPERATOR's minimum fee expressed in Exhibit B shall be increased annually by the lesser of (i) the percentage increase in the Department's revenue per patient day and (ii) the percentage increase in the Hospital Market Basket Index, as published by the American Hospital Association, or appropriate successor index (the "Index"); provided however, that in any year in which there is either no change or a percentage decrease pursuant to subsection (i) or (ii) above, the minimum fee shall not be changed and provided, further, that the calculations in any year pursuant to subsection (i) and (ii) above shall be adjusted for any decrease, if any, in the immediately preceding years. The percentage calculated pursuant to subsection (i) above shall be a fraction, the numerator of which is the revenue per patient day for the year just ended and the denominator of which is the revenue per patient day for the prior year. The percentage calculated pursuant to subsection (ii) above shall be a fraction, the numerator of which is the most recently published Index and the denominator of which is the last published Index immediately prior to the beginning of the most recently concluded 12-month period of this subsection Agreement. The first adjustment shall be made as of the first day of the thirteenth (13th) month of the term of this Agreement and shall be based solely upon subsection (ii) above, and subsequent adjustments shall be made on each annual anniversary date thereafter.
(d) Nothing in this Agreement shall be construed or interpreted as a prohibition against the parties mutually deciding to renegotiate the compensation under this Agreement.
(e) In the event that it shall be determined by the Hospital's Medicare intermediary to deny reimbursement for any portion of the compensation paid by LIFEMARK to OPERATOR, OPERATOR *1345 agrees to pay Client within sixty (60) days after such determination a sum equal to one hundred percent (100%) of the amount of reimbursement denied. This section shall remain effective after the termination of this Agreement.
4.2 OPERATOR shall supply LIFEMARK an invoice on or before the tenth (10th) of each month for goods and services provided under this Agreement during the preceding month. LIFEMARK agrees to pay OPERATOR in Kenner, Louisiana, such monies due not later than thirty (30) days after such invoice is provided.
5. Term of Agreement.
5.1 This Agreement shall be effective as set forth above and shall continue in full force and effect, unless sooner terminated with the first to occur of the following:
(a) If Hospital is substantially destroyed by casualty not caused by LIFEMARK and LIFEMARK fails to undertake diligent and timely repair, restoration, rebuilding or replacement of any such damage or destruction, OPERATOR may terminate upon thirty (30) days notice to LIFEMARK.
(b) Either party shall remain in breach of this Agreement for a continuous, unabated 30-day period after receipt of written notice of such breach from the other party. Should OPERATOR; or any of LIFEMARK's corporate affiliates, be in default of any other contractual agreement with LIFEMARK or any of LIFEMARK's corporate affiliates, including, but not limited to, the lease relating to the Hospital, then OPERATOR shall be in breach of this Agreement.
(c) If either party (i) applies for or consents to the appointment of a receiver, trustee, liquidator or similar official, (ii) files a voluntary petition in bankruptcy or admits in writing its inability to pay its debts as they come due, (iii) makes a general assignment for the benefit of creditors, (iv) files a petition or answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or (v) is subject to an order, judgment or decree entered by any court, on the application of a creditor or otherwise, adjudging such party a bankrupt or insolvent or appointing or providing for the taking of possession by a receiver, trustee, liquidator or similar official and any such order, judgment or decree shall continue unstayed and in effect for thirty (30) consecutive days, then the other party may terminate this Agreement upon notice to such party.
(d) Termination pursuant to provisions set forth elsewhere herein.
(e) LIFEMARK ceases to lease or operate Hospital.
6. Indemnity and Insurance.
OPERATOR and LIFEMARK each agree to indemnify and hold harmless the other from and against any and all manner of claims, demands and causes of action (including reasonable costs and attorney's fees) arising from or incident to the negligent or wilful act or omission of such respective party. Notwithstanding the foregoing, OPERATOR shall obtain and maintain during the term of this Agreement a liability insurance policy in an amount of not less than One Million Dollars ($1,000,000) per occurrence and Ten Million Dollars ($10,000,000) annual aggregate and shall provide LIFEMARK with a certificate evidencing same.
7. Restrictive Covenant.
OPERATOR recognizes that LIFEMARK's entrance into this Agreement is induced in part by covenants and assurances made by OPERATOR that OPERATOR will not hire LIFEMARK's employees since irrevocable harm and damage will be done to LIFEMARK and its affiliates (as that term is defined by the Securities Exchange Act of 1934, jointly and severally its "Affiliates") in the event OPERATOR hires any employee of LIFEMARK or its Affiliates. Therefore, *1346 OPERATOR agrees that during the term of this Agreement, and for a period of one year thereafter, OPERATOR will not, directly or indirectly, knowingly hire, contract with or be in any way associated with any employee or former employee of LIFEMARK or its Affiliates. With respect to former employees, this restrictive covenant applies only for one year after employment with LIFEMARK or its Affiliates. Provided further, OPERATOR agrees that any attempt to induce any such employee to terminate her or his employment with LIFEMARK or its Affiliates shall entitle LIFEMARK to injunctive relief without necessity of bond, all in addition to any other rights to which LIFEMARK is entitled.
8. Early Termination.
8.1 Notwithstanding any provision to the contrary, the parties hereto stipulate and agree that this Agreement may be terminated by OPERATOR at any time if OPERATOR is not in default hereunder, such termination effective not less than ninety (90) days after communication of written notice to LIFEMARK of an intent to so terminate.
8.2 This Agreement may be cancelled by LIFEMARK upon the giving of ninety days notice if OPERATOR fails to obtain a score of 90% in the Quality Assurance Program survey. A copy of the Quality Assurance Program is attached to this Agreement, marked as Exhibit C and is incorporated for all purposes herein as thought fully recited. Exhibit C will be updated and amended by LIFEMARK Pharmacy on a periodic basis as needed. All updates and amendments will be considered part of this Agreement. The Quality Assurance survey shall be conducted twice per year by a representative of LIFEMARK Pharmacy. OPERATOR may cure the deficiency in the Quality Assurance survey and avoid termination of this Agreement if it achieves a score of 90% in a resurvey, which shall take place within forty-five days of receipt of the notice to terminate given by LIFEMARK under this section. OPERATOR shall request such a resurvey by giving notice of such a request within fifteen days after receiving notice of termination by LIFEMARK under this section.
9. Permits.
LIFEMARK agrees to allow, or cause to allow, OPERATOR to act with regard to operations of the Department under permits or licenses issued in the name of LIFEMARK or Hospital by the applicable state and federal regulatory agencies, the Drug Enforcement Administration, and the Food and Drug Administration to the extent permitted by law.
10. Severability.
In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.
11. Choice of Law.
This Agreement shall be governed by the laws of the State of Louisiana.
12. Waiver.
The waiver of breach of any term or condition of this Agreement shall not be deemed to constitute the continuing waiver of the same or any other term or condition.
13. Proprietary Items.
It is expressly understood that the systems, methods, procedures, written materials and controls employed by LIFEMARK or LIFEMARK Pharmacy in the performance or monitoring of this Agreement are proprietary in nature, shall remain the property of LIFEMARK or LIFEMARK Pharmacy and shall not, at any time, be utilized, distributed, copied, or otherwise employed or acquired by OPERATOR unless approved by LIFEMARK *1347 or LIFEMARK Pharmacy in writing.
14. Independent Contractor.
OPERATOR is an independent contractor and is not a general partner, limited partner, or employee of LIFEMARK or any subsidiary of LIFEMARK Corporation. This Agreement does not constitute a joint venture between the parties hereto. OPERATOR shall perform all its duties herein in a manner consistent with this Agreement and the policies generally applicable to LIFEMARK's Hospital.
15. Notices.
Any notice, statement or bill provided for in this Agreement shall be in writing and shall be considered as having been given if mailed by United States certified or registered mail, return receipt requested, postage prepaid, properly addressed to the following respectively:
 LIFEMARK: LIFEMARK HOSPITALS
 OF LOUISIANA, INC.
 P.O. Box 3448
 Houston, Texas 77001
 OPERATOR: Liljeberg Enterprises,
 Inc.
 2713 Piedmont Street
 Kenner, Louisiana 70062
or such other address as either shall notify
the other party in writing pursuant to
this Section.
16. Modification and Amendment.
This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all previous negotiations, commitments, and writings. It may not be changed or modified except by a written instrument signed by both parties.
17. Assignment.
Operator may not assign this Agreement without the written permission of LIFEMARK.
18. OPERATOR's Books and Records.
Pursuant to Section 1395x(v)(1) of Title 42 of the United States Code and applicable rules and regulations thereunder, until the expiration of four (4) years after termination of this Agreement, OPERATOR shall make available, upon appropriate written request by the Secretary of the United States Department of Health and Human Services or the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of the costs of the services provided by OPERATOR under this Agreement. OPERATOR further agrees that in the event it carries out any of its duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a 12-month period with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon appropriate written request by the Secretary of the United States Department of Health and Human Services or the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of such subcontract and such books, documents and records of such organization as are necessary to verify the nature and extent of such costs.
IN WITNESS WHEREOF, the parties hereto have executed this Agreement in multiple originals as of the date first set forth above.
LIFEMARK HOSPITALS OF LOUISIANA, INC.
By: /s/Paul M. Frison
 Paul M. Frison, President
LILJEBERG ENTERPRISES, INC.
By: /s/John A. Liljeberg, Jr./president
 John A. Liljeberg, Jr., President

*1348 EXHIBIT A

FORMULA FOR CALCULATION OF INVENTORY VALUE
The drug purchase price shall be the latest net invoice price, not to include discounts for early payment, as solely determined by LIFEMARK Pharmacy.
The intravenous solutions purchase price shall be the latest net invoice price, not to include discounts for early payment, as solely determined by LIFEMARK Pharmacy.

EXHIBIT B

ST. JUDE HOSPITAL
LIFEMARK shall reimburse the OPERATOR the greater of (i) the minimum fee set forth below or (ii) a fee equal to 1.35 times cost as identified by invoice.

 Drug Category Minimum Fee
Orals
Solid $ .53
Liquid .63
CII Controlled Drug .56
Suppositories .53
Parenterals
Per Dose 2.80
CII Controlled Drug 3.00
Partial Fill I.V.'s (Piggybacks) 5.25 (includes
 cost of
 solution)
Miscellaneous
Opthalmics, Externals, Otics, 1.40
 etc.

Fees for items or categories not identified above shall be established in a manner consistent with the development schedule.
LIFEMARK shall reimburse the OPERATOR a flat fee for handling the following items:

I.V. Handling fee for NonAdditive,
large volume parenterals $ 1.00
I.V. Additive Fee 1.70

*1349
 Mr. Irv Gregory
 1614 Carrol
 Houston, Texas 77090
 Dear Irv:
 On February 10, 1983, Lifemark hospitials of Louisiana, Inc. and
 Liljeberg Enterprises, INc. entered into a "Clinical Pharmacy
 Mangement Agreement." Of course, when American Medidcal Internacional
 acquired Lifemark, they also acquired this Agreement.
 A disagreement in interpretation has arisen with AMI over the
 calculation of the compensation due under Exhibit B. The pertinent
 paragraph is as follows:
 "LIFEMARK shall reimburse the OPERATOR the greater of (i)
 the minimum fee set forth below or (ii) a fee equal to
 1.35 times cost as identified by invoice."
 AMI interprets this paragraph so that the total reimbursement to us
 would be 1.35 times the cost or $13.50 on an item costing $10.00
 Our understanding is that our fee would be $13.50 on an item costing
 $10.00 and the reimbursement would be $23.50 - the fee of $13.50 plus
 the cost of $10.00.
 In your former capacity as vice president of Lifemark, you were actively
 involved in negotiation this Agreement.
 Our reollection of these negotiations is as follws:
 We (Lifemark and Liljeberg) had agreed to a fee to Liljeberg
 of approximately 402 of the total Hospital's pharmaceutical
 charges. However, the parties agreed a contract providing
*1350
 Mr. Irv Gregory
 Page 2
 November 11, 1985
 for a precise 402 fee was in violation of Medicare/Medicade
 regulations. Therefore. based on Lifemark's experience,
 the present agreement was drafted with the anticipation
 that it would generate to the Operator approximately 402
 of the Hospital pharmcy gross charges after contractual
 adjustments and a 52 bad debt allowance.
 If this is your understanding of what took place, we ask that you
 confirm that understanding by signing this letter and returning it
 to us.
*1351
 Mr.John W. McDaniel
 Executive Director
 St. Jude Medical Center
 180 West Esplanade Avenue
 Kenner, Louisiana 70065
 Dear Jonh:
 Certain matters were discussed at the meeting we had yesterday afternoon,
 I feel require clarification.
 Specifically, I am not concerned with hospitals that operate under
 pharmacy contracts similar to ours. What renders them entirely different
 is the simple fact that my brother and I own St. Jude Medical
 Center. When negotiating the selection of a hospital managment company
 to lease St. Judge, the operation of hospital pharmcy was a bargaining
 chip I held in my stack. You should understand, Lifemark didn't with to
 relinquish control of the pharmacy...it had to. Otherwise, it would have
 been eliminated as a contender as a lessee.
 The bottom line of what we were willing to accept as compensation for
 owning and operating the pharmacy was a very near approximate gross
 return of 402 of Lifemark's gross pharmacy billings. At year's end,
 I'll expect an adjustment to bring it into that neighborhood.
 The parties to the pharmacy contract...and I'm well prepared ot establish
 this fact...intended the return to be a fee of 1.352 times cost to be
 added to the cost of the merchandise. To interpret a "fee" as inclusive
 of cost is ludicrous.
 Any reasonable man will agree that a 602 return to AMI, with all the
 headaches and overhead being borne by me, should be more than adequate.
 Another matter mentioned briefly was the deduction of 52 as bad debt
 expense. From a comment made by Scott. AMI hasn't yet determined what
 its bad debts are at this point. When the percentage write-off of
*1352
 Mr. John W. McDaniel
 Page 2
 February 7, 1986
 uncollectibles resulting from pharmacy charges is actually ascertained,
 I expect the 52 withheld to be adjusted to reflect the true expense.
 To phrase it another way, we will absorb our share of the actual,
 substantiatied loss but no more. Nothing could be fairer.
 Scott mentioned the possibility of AMI buying our DOSE system and
 replacing it with one compatible with Intercare. We have absolutely no
 interest in replacing DOSE with any other system. At your suggestion,
 we will investigate the cost of an interface system so we may both retain
 what we already have.
 Pertaining to our discussion regarding the operation of the pharmacy,
 let me remind you, AMI requested we provide par levels in carts. We
 did it. In terms of oulandish inventories, the par levels were soon
 out of control. As a portential remedy, AMI requested 24-hour pharmacy
 service. We did it. The problem, of course, is that there has been
 no significant reduction of the par levels and we are still manning the
 pharmacy around the clock.
 This pharmacy will continue to operate effectively and in full compliance
 with reasonable quality assurance programs. We reserve the right, however,
 to adjust personnel levels whenever austerity measures are appropriate.
 Please consider these facts and let me have your thorughts on them.

ON APPLICATION FOR REHEARING
PER CURIAM.
Lifemark Hospitals of Louisiana, Inc. has applied for rehearing of our opinion dated January 28, 1993, arguing that this Court awarded an incorrect amount of damages to Liljeberg Enterprises, Inc. for cost of pharmaceuticals. LEI was given the opportunity to respond to this argument but failed to do so.
Upon further examination of the record, this Court determines that the correct amount of the cost of pharmaceuticals is $3,965,659.00 as stated in the report of Peat Marwick dated September 20, 1989 which was introduced at trial by defendants as D-183. We therefore grant Lifemark's application for rehearing solely as to this issue, and amend our original opinion to provide an award of damages for the cost of pharmaceuticals in the amount of $3,965,659.00, rather than $4,534,731.00 as stated in the opinion.
Accordingly, the judgment shall provide as follows:

*1353
Cost of Pharmaceuticals $3,965,659.00
Escalation of Minimum Fee 274,471.00
Blood Derivative Products 169,191.00
 _____________
TOTAL $4,409,321.00

Lifemark further contends that our original opinion does not adequately provide for the allowance for bad debt as provided in the contract between the parties. However, as stated in our original opinion at page 3, the parties stipulated prior to trial to the severance of the issue of bad debt for determination at a later date, and no evidence was presented on this issue at trial.
Although this issue was therefore not before us, we reserved to Lifemark the right to raise the issue at a later date. Original Opinion, page 3. Nevertheless, we amend the judgment rendered in this case to include this holding.
It is therefore ordered that the judgment be restated as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Liljeberg Enterprises, Inc. and against Lifemark Hospitals of Louisiana, Inc., in the sum of $4,409,321.00, with legal interest from the date of judicial demand until paid and for all costs of the proceedings at the trial level. Each party to bear its own costs of this appeal.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the claim for reimbursement for bad debt of Lifemark Hospitals of Louisiana, Inc. which was severed prior to the trial of this matter, is subject to a later determination at the trial level, upon presentation of adequate proof by Lifemark.
In all other respects, the rehearing applications of Lifemark and LEI are denied.