| ¡DALEY, J.,
dissenting with reasons.
I respectfully dissent from the majority opinion.
This award has the absurd effect of PNC being forced to give the Labadies more than 20 weeks of paid vacation per year, in addition to their salaries and bonuses, which is contrary to the Agreement or any custom in the physician employment arena.
The threshold issue is how are on-call days off to be characterized? As the majority opinion states, the contractual dispute arises from two clauses in the employment contract: Section 5.2, which obligates the Doctors to be available for “on-call coverage” and provides that Doctors “shall accrue one day off after each call period.” Section 8.2.2 provides that the Doctors, “shall accrue thirty-one (31) paid days for vacation, holiday and sick leave per year.”
I find the contract is not clear regarding whether Dr. Eugenio Labadie and Dr. Juan Labadie were to be paid for accumu *1284 lated days off due to call duty; therefore, standard rules of contract interpretation must be applied to decide the application of the contract language to the dispute between the parties. A contract should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve and absurd conclusion.[1] When the words of a contract are clear and explicit and lead |2to no absurd consequences, no further interpretation may be made in search of the parties’ intent. LSA-C.C. art. 2046. Only when the agreement is unclear, ambiguous, or will lead to absurd consequences, should a court go beyond the written agreement to gather the parties’ true intentions.[2]
PNC argues that Section 5.2 of the contract cannot be construed to create additional paid vacation days when considered in light of Section 8.2.2, which expressly provides for a limited number of paid vacation days per year. The Labadies argue that they requested additional vacation days when they negotiated their contract and that the accrued call days off provision of the contract was a method of giving them more vacation time without interfering with PNC’s standard policy of 31 paid days of vacation per year.
The fact that the Agreement used the word “accrue” when discussing call days off, suggests that these days could in fact be “banked” and did not have to be used immediately following a night of difficult call, but the contract is silent as to whether call days would be paid vacation days. The fact that a minimum of thirty-six hours of work per week was required under the contract suggests that if the doctor worked extra hours, while on call, he could take additional days off to compensate for call hours worked, similar to comp time. The ability to take days off as a result of on-call duty does not automatically create extra paid vacation days. The testimony in the record establishes that there was never any discussion about whether the call days off would result in additional compensation.
The Labadies cite a group of cases that all stand for the proposition that vacation pay is considered wages. PNC does not disagree with this point, and points |sout that the Labadies must first prove that the parties “call days off’ were to be paid vacation days. The cases hold that if the parties agreed on paid vacation, or if it was the company policy that vacation days were paid, the paid vacation was to be considered wages and was therefore payable in the manner of wages, including the right to receive payment for unused vacation upon the end of employment.[3] A Fifth Circuit case, Howser v. Carruth Mortgage Corp.[4] held that a former employee was not entitled to compensation in lieu of vacation time not taken upon her resignation, where it was not the employer’s policy to compensate employees for vacation time not taken.
Contractual ambiguities must be construed in light of equity, usage, and the parties’ conduct. Louisiana Civil Code articles 2053 and 2054 provide:
*1285 A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.
When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
The trial court’s interpretation is inconsistent with substantially all of the relevant factors cited in Civil Code articles 2053 and 2054. LSA C.C. art. 2053 provides that “a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, [and] the conduct of the parties before and after the formation of the contract....”[5] When the employment contract does not express the | ¿parties’ intent as to the method of calculating certain benefits, parol evidence must be used to determine that intent.[6] A good way to determine what parties to a contract intended is to look at the method in which the contract is performed, particularly if done consistently over and over again for a period of time.[7]
Mike Taylor testified that he started working with the Labadies in 1993 or 1994. He participated in the contract negotiations with PNC on behalf of the Labadies. He testified that he thought their contract with PNC/Tenet was very favorable to the doctors, especially considering the opportunity to make bonuses each year. He said there were no discussions at all, either way, about keeping track of vacation days and whether they could- be rolled over from year to year. There was no discussion if the call days were to be paid. Taylor testified that the call days off were for recuperation after a difficult night of call. He said there was no discussion about banking call days off and using them later down the road. He also said there was no discussion about getting paid for these unused days, one way or another.
Before he became an employee of PNC, Dr. Labadie took approximately 5-7 weeks of vacation per year, or between 25 and 35 working days per year. Dawn Ruiz, the Labadie’s office manager and former physician liaison with Meadowcrest Hospital, testified that before the Labadies became employed by PNC, they each only took between 5 and 6 weeks of vacation per year. Significantly this practice of taking between 25 and 35 vacation days per year did not change during the five years that both Doctors worked for the defendant.
IsThe trial court’s interpretation of the Agreement is contrary to the Labadies’ own past practice with respect to vacation, PNC’s practices, as well as generally accepted practices among physicians. Additionally, in this case, the trial judge applied the wrong burden of proof.
The trial judge stated in his reasons that the defendants presented no evidence that the “call” days off would be unpaid, so they would be considered paid vacation. It is plaintiffs’ burden, not defendant’s, to show that the call days would be paid. It is the *1286 Labadies’ burden of proof to show that call days off were to be considered vacation days, because only if they are considered vacation days, do the cases on paid vacation time apply. The Labadies testified that they interpret the employment contract to allow the conversion of the accumulated call days to vacation days. All other evidence, including the testimony of Mike Taylor, who assisted the Labadies in negotiating the contract, the past and current practice by both Doctors, as well as customary practice in the medical profession, dictates in favor of defendants interpretation. I, therefore, find the trial judge erred in requiring the defendant to prove that call days off would be unpaid. I find that the bulk of the evidence suggests that call days off would not result in additional compensation. Consequently, I would reverse.

. Ducote v. Koch Pipeline Co., L.P., 98-0942 (La. 1/20/99), 730 So.2d 432, Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180.

. State Dept. of Transp. And Development v. Unknown Owners, 27,150 (La.App. 2d Cir.9/27/95), 661 So.2d 626, writ denied, 95-2497 (La. 12/15/95), 664 So.2d 459.

. Beard v. Summit Institute, 707 So.2d 1233 (La.1998).

. 476 So.2d 830 (La.App. 5 Cir.1985).

. Amoco Production Co. v. Fina Oil & Chemical Co., 95-1185, p. 12-13 (La.App. 1st Cir.2/23/96), 670 So.2d 502, 511, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037.

. Liljeberg Enterprises, Inc. v. Lifemark Hospitals of La., Inc., 620 So.2d 1331, 1336 (La. App. 4th Cir.), writs denied, 621 So.2d 818 (La.f1993).

.Gamble v. D.W. [94-2423 La.App. 4th Cir. 16] & Associates, 509 So.2d 1041, 1043 (La. App. 3rd Cir.), writ denied, 514 So.2d 454 (La.1987).