686 So.2d 87 (1996)
Rickey PATTERSON,
v.
CITY OF NEW ORLEANS.
Lea Smith, wife of/and Toney KERSH, et al.,
v.
UNIVERSITY OF NEW ORLEANS, et al.
Nos. 96-CA-0367, 96-CA-0843.
Court of Appeal of Louisiana, Fourth Circuit.
December 18, 1996.
Writ Denied March 14, 1997.
*88 Joseph G. Albe, Metairie, for plaintiff/appellant Rickey Patterson.
Mary-Elizabeth Paltron, General Counsel, Jacob Taranto, III, Assistant Special Counsel, John D. Lambert, Jr., Special Counsel Sewerage and Water Board of New Orleans, New Orleans, for defendant/appellee.
Sidney J. Angelle, Michael J. Tarleton, Lobman, Carnahan and Batt, Metairie, for plaintiff/appellant Lea Smith, Wife of/and Toney Kersh.
Before ARMSTRONG, JONES and MURRAY, JJ.
ARMSTRONG, Judge.
These two consolidated appeals involve personal injury cases. One is a single vehicle accident. The other is a slip and fall. Both accidents occurred at an underpass of Press Drive below a railroad track. Each allegedly occurred because of a slick condition involving algae which grew due to seepage of water in the underpass. Each plaintiff sued both the City of New Orleans and the Sewerage and Water Board ("S & WB"). Each plaintiff settled with the City but went to trial against the S & WB. The two actions were tried together on a consolidated basis. The trial, which was a bench trial, was bifurcated into liability and damages phases. At the conclusion of the liability phase, the trial court found no liability of the S & WB. Each of the plaintiffs has appealed. Because we find no error in the result reached by the trial court, we affirm.
The trial court found, and the undisputed evidence shows, that the Press Drive underpass was constantly or frequently wet due to seepage of water from expansion joints in the embankments of the underpass. This caused algae to grow in the underpass which created a slick condition. This problem was compounded by pigeon droppings which, apparently, added to the slickness. These facts basically were uncontested at trial, and are not contested on appeal. Certainly, these factual findings of the trial court are not manifestly erroneous or clearly wrong. See Stobart v. State, through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
The trial court also found that a van driven by plaintiff Ricky Patterson slid out of control, which slide caused it to turn over, because of the slick condition of the street in the Press Drive underpass. The trial court found that plaintiff Ricky Patterson was driving the van at a reasonable speed and was not comparatively at fault. The trial court also found that plaintiff Lea Smith slipped and fell because of the slick condition of the sidewalk and that Ms. Smith was proceeding in a reasonable manner and was not comparatively at fault.
The trial court concluded that the Press Drive underpass was in an unreasonably dangerous condition and that the City, which had known of the condition of the Press Drive underpass for many years prior to the plaintiffs' accidents, was negligent. Of course, the *89 City had settled with both plaintiffs prior to trial. Thus, the key issue was whether the S & WB also was liable with regard to the condition of the Press Drive underpass. It is undisputed that the S & WB, like the City, had known of the condition of the Press Drive underpass for many years prior to the plaintiffs' accidents. The S & WB had done nothing to remedy the condition except to call it to the attention of the City. However, the S & WB argued, and the trial court agreed, that the S & WB was not responsible for the water seepage which caused the algae growth and the slick condition in the underpass. We find no error with this conclusion.
The evidence at trial was that the water seeping into the underpass was natural ground water and was not water from any S & WB line. The underpass is about one half mile from Lake Pontchartrain and is about 17 feet below the level of the lake. One would expect that there would be ground water from the lake at that location and depth. When the water seeping into the underpass was tested chemically, it proved to be consistent with being ground water from the lake and to be inconsistent with being water from a S & WB line. In particular, the water seeping into the underpass had a high level of "chlorides" (salt, apparently, and not chlorine) which was similar to lake water but not water from a S & WB line. Also, the S & WB line in the area was shut off for several weeks, as a test, and the seepage of water into the underpass continued, which indicates that the S & WB line was not the source of the water seeping into the underpass. These findings of the trial court as to the source of the water seeping into the underpass apparently are not challenged on appeal and, in any case, are well supported by the evidence and are certainly not clearly wrong or manifestly erroneous. See Stobart, supra; Rosell, supra.
A system of six inch and eight inch perforated pipes, referred to as "filter beds" (or "French drains") was installed under the roadway and embankments of the underpass in anticipation of a ground water problem. These filter beds are connected to the S & WB's drainage lines which carry away collected water. These filter beds were designed and constructed by the State's Highway Department and the City's Department of Streets as part of the original construction of the underpass. They were not designed, constructed or approved by the S & WB. Also, these filter beds are not accessible for maintenance (without tearing up the street) and have never been maintained by the S & WB. The trial court found, based upon the expert testimony of a S & WB engineer, John R. Huerkamp, that the filter beds had become clogged up with sand, so that they did not function, and that this resulted in the seepage of ground water into the underpass. The trial court obviously found Mr. Huerkamp to be credible as to this point (and, in fact, commented on the record that Mr. Huerkamp was a "candid" witness). Such questions of credibility are primarily the responsibility of the trier of fact. Stobart, supra; Rosell, supra. The trial court's finding that the sand clogging up the filter beds was the cause of the water seeping into the underpass is not, apparently, challenged on appeal and, in any case, is certainly not clearly wrong or manifestly erroneous. Id.
The issue thus resolves into one of whether the S & WB, as opposed to just the City, is responsible for the filter beds and, in particular, for remedying the clogging-up of the filter beds. The plaintiffs argue that the S & WB is responsible for the filter beds under the terms of a 1987 contract between the City and The S & WB which provides in pertinent part:
A. The parties acknowledge that subsurface drainage is a part of the street.
B. Subsurface drainage is hereinafter defined as all catch basins attached to said drainage lines and all drainage lines smaller than thirty-six (36") inches in diameter. Lines thirty-six (36") inches and larger shall be considered part of the major drainage systems of the City of New Orleans and therefore the Board is responsible for maintenance, repair and replacement.
C. For the mutual considerations received and the benefits to be derived for the citizens of the City, the Board, agrees to maintain and repair the subsurface drainage. Such repair and maintenance *90 shall not be an assumption of responsibility for installation or an indication of ownership. (emphasis added).
The contract provided that "subsurface drainage" includes all "drainage lines" smaller than 36 inches in diameter and that the S & WB agrees to maintain and repair "subsurface drainage". The plaintiffs argue that the 6 inch and 8 inch diameter perforated pipes of the filter beds are "drainage lines" and, being smaller than 36 inches in diameter, are "subsurface drainage" for which the S & WB is responsible.[1]
The S & WB argues that the perforated pipes of the filter beds are not "drainage lines" within the meaning of the contract. The S & WB introduced the testimony of Mr. Huerkamp in support of its interpretation of the contract. The plaintiffs object to this testimony on the ground that the contract is clear and unambiguous and so no extrinsic evidence ("parole evidence") is admissible as to its meaning. The trial court held (1) that the contract is vague and ambiguous and, therefore, Mr. Huerkamp's testimony was admissible, and (2) that the contract did not make the S & WB responsible for the condition of the underpass (in view of the trial court's finding that the clogged filter beds caused the condition of the underpass, the trial court's decision necessarily implies that the S & WB was not responsible for the filter beds). The plaintiffs attack both of these holdings of the trial court.
As a general rule, extrinsic evidence may not be admitted to "negate or vary" the contents of a written contract. La. Civ.Code art. 1848. Thus, while the interpretation of a contract is the determination of the common intent of the parties, La. Civ.Code art. 2045, if "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent". La. Civ. code art. 2046.
However, if a contract is ambiguous, then extrinsic evidence may be used to interpret it.
Although parol evidence is inadmissible to vary terms of a written contract, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity and to show the intent of the parties.
Avis v. Anderson, 94-1545 (La.App. 4th Cir. 1/19/95), 649 So.2d 1089, 1093; Accord Liljeberg Enterprises Inc. v. Lifemark Hospitals of Louisiana, Inc., 620 So.2d 1331, 1336 (La. App. 4th Cir.), writ denied, 621 So.2d 818 (La.1993).
"Whether a contract is ambiguous or not is a question of law.... Appellate review of question(s) of law is simply whether the trial court's interpretive decision is legally correct." McCrory v. Terminix Service Co. Inc., 609 So.2d 883, 886 (La.App. 4th Cir.1992).
We believe that the contract is ambiguous as to whether or not the perforated pipes of the filter beds are "drainage lines" within the meaning of the contract. In the usual context, the term "drainage line" is likely to refer to a solid (i.e. not perforated) pipe that carries water from one place (e.g. a catch basin at the curb of a street) to another place (e.g. a pumping station or a canal). Also, the term "drainage line" implies a linear connection between two points or a linear series of such connections one after the other. In contrast, the pipes of the filter beds are described in the testimony as resembling the veins of a leaf. The fact that the pipes of the filter beds are physically different from the usual drainage lines is highlighted by the drawings of the firm which designed the underpass. Those drawings show the pipes *91 of the filter beds with dashed lines and the usual drainage lines, to which the filter bed pipes are connected, with solid lines.[2]
It is apparent that the term "drainage lines" in the contract is a technical term that must be understood with technical expertise rather than the usual understanding of lay persons.
The words of a contract must be given their generally prevailing meaning.
Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.
La. Civ.Code art. 2047. "[T]echnical terms must be given their technical meaning when the contract involves a technical matter". Amend v. McCabe, 95-0316 (La.12/1/95), 664 So.2d 1183, 1187. Accord Frey v. Amoco Production Co., 603 So.2d 166, 172 (La.1992).
Because the technical term "drainage lines" must be given its technical meaning, the expert testimony of Mr. Huerkamp as to the meaning of "drainage lines" was proper.
When words of art and technical terms are used in a contract that involves a technical matter, those words and terms must be given their technical meanings. There should be little doubt that extrinsic evidence, such as testimonial proof, is many times the only way in which the court may be informed of the technical meaning of words of art and technical terms, which sufficiently explains that such evidence is admissible for that purpose. Thus, if a contract of lease states that the lessee will use the premises only for the practice of general dentistry, the testimony of expert dentists is admissible to explain whether the practice of orthodontics is included in the general practice of dentistry. Likewise, the testimony of expert engineers is admissible to explain whether the term per running foot found in a street-paving contract means per running foot of property front or per running foot of street.

5 Litvinoff, Louisiana Civil Law Treatise: Obligations § 12.101 at 404 (1992) (footnotes omitted).
Mr. Huerkamp testified that the perforated pipes of the filter beds do not constitute "drainage lines" as that term is used by the S & WB or by the S & WB contract with the City. He explained that drainage lines have to meet certain S & WB requirements and that perforated pipes could never meet those requirements. He also explained that the relevant section of the contract was intended by the S & WB and the City to provide for S & WB maintenance and that the perforated pipes of the filter beds could never be maintained by the S & WB because they were not accessible for maintenance. As Mr. Huerkamp testified, the filter beds were designed, not to be maintained, but instead to be "covered up by the street and forgotten about". Thus, it would have been irrational to have provided in the contract for the S & WB to maintain the perforated pipes of the filter bed.
Mr. Huerkamp also testified that, prior to the accidents involved in this case, the City had designed a remedy for the clogged perforated pipes of the filter drains but, apparently because of budget constraints, did not implement that remedy. This certainly would be indicative that the City viewed itself, and not the S & WB, as responsible for the filter beds. Mr. Huerkamp also testified that, after the accidents involved in this case, the City actually did implement an interim remedy for the condition of the filter beds. This subsequent remedial measure evidence, admissible for the limited purpose of showing the City's control over the filter beds (as opposed to negligence), La.Code Evid. art. 407, is also indicative that the filter beds are the responsibility of the City rather than the S & WB. "A *92 doubtful [contract] provision must be interpreted in light of ... the conduct of the parties before and after the formation of the contract." La. Civ.Code art. 2053. See Avis v. Anderson, 94-1545 (La.App. 4th Cir. 1/19/95), 649 So.2d 1089, 1093 (party's conduct indicative of meaning of ambiguous contract clause).
We believe that the trial court was correct in concluding that the contract between the City and the S & WB does not result in the S & WB being responsible for the slick condition of the underpass. The slick condition arose because the perforated pipes of the filter beds became clogged by sand. The S & WB is not responsible for those perforated pipes. The S & WB did not install or maintain those perforated pipes and did not contractually assume the obligation to maintain them.
For the foregoing reasons, the judgment below is affirmed.
AFFIRMED.
JONES, J., dissents.
JONES, Judge, dissenting.
The contract between the City of New Orleans (City) and the Sewerage and Water Board (S & WB) is not ambiguous in any manner. The necessity of relieving her citizens of ground water is just as important to the City as is standing flood water. Therefore, the City would contract with the agency best capable of handling these tasks.
The S & WB cannot simply turn its head from a known drainage defect with impunity. For this reason, I would find liability and award damages.
NOTES
[1] The plaintiffs assume that, if the filter beds are the S & WB's responsibility under the contract, then the plaintiffs have a cause of action against the S & WB for failure to maintain the filter beds. The plaintiffs, pointing to the contract's reference to "the benefits to be derived for the citizens of the City" assert that they are third-party beneficiaries of the contract. In view of our holding below that the S & WB is not responsible for the filter drains, we need not decide whether the plaintiffs are third-party beneficiaries and so we express no opinion as to that issue.
[2] The plaintiffs do not argue on appeal that, just because the perforated pipes of the filter beds are attached to the S & WB's drainage lines, the filter beds become the responsibility of the S & WB. We express no opinion as to whether, just because a drainage structure of some type is ultimately connected to S & WB's drainage system, the S & WB will become responsible for that structure. See generally Brown v. State, DOTD, 513 So.2d 379, 381 (La.App. 4th Cir.), writ denied, 515 So.2d 446 (La.1987) (where plaintiff injured on manhole cover of DOTD drainage line, which drainage line emptied into S & WB canal, S & WB not responsible for manhole cover).